Dave Deonarine (Bar No. 243733)
dave.deonarine@procopio.com
Pattric J. Rawlins (Bar No. 205160)
pattric.rawlins@procopio.com
Jacob K. Poorman (Bar No. 262261)
jacob.poorman@procopio.com

PROCOPIO, CORY, HARGREAVES &
   SAVITCH LLP
12544 High Bluff Drive, Suite 400
San Diego, CA 92130
Telephone: 858.720.6300
Facsimile: 619.235.0398

Attorneys for Plaintiff Hylete, Inc.

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HYLETE, INC., a Delaware corporation,<br><br>                Plaintiff,<br><br>v.<br><br>HYBRID ATHLETICS, LLC, a Connecticut limited liability company; and ROBERT ORLANDO, an individual,<br><br>                Defendants. | Case No. **'19CV2494 WQHAGS**<br><br>**COMPLAINT FOR:**<br><br>**(1) FRAUDULENT PROCUREMENT OF U.S. TRADEMARK REGISTRATION NO. 4,609,469**<br>**(2) CANCELLATION OF U.S. TRADEMARK REGISTRATION NO. 4,609,469;**<br>**(3) VIOLATION OF LANHAM ACT 15 U.S.C. § 1125(a);**<br>**(4) VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *et seq.*);**<br>**(5) VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT; AND**<br>**(6) TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Hylete, Inc. ("Hylete"), for its claims against Defendants Hybrid Athletics LLC ("HA") and Robert Orlando ("Orlando"), alleges upon knowledge with respect to its own acts, and upon information and belief as to other matters, as follows:

## NATURE OF THE CLAIM

1.     This complaint seeks: (a) remedies for the fraudulent procurement of U.S. Trademark Registration No.4,609,469 ("the '469 Registration") pursuant to Section 38 of the Lanham Act, 15 U.S.C. § 1120; (b) cancellation of the '469 Registration pursuant to Section 37 of the Lanham Act, 15 U.S.C. § 1119; (c) remedies for violations of the California Unfair Competition Law (California Business & Professions Code § 17200, *et seq.*; (d) remedies for violations of the Connecticut Unfair Trade Practices Act; (e) remedies for false advertising under the Lanham Act; and (f) remedies for intentional interference with Hylete's prospective economic advantage.

## THE PARTIES

2.     Hylete is a corporation organized under the laws of the State of Delaware with a principal place of business at 564 Stevens Avenue, Solana Beach, CA 92075.

3.     Upon information and belief, HA is a limited liability company having its principal place of business at 76 Progress Drive, Stamford, CT 06902, and operating under the Connecticut State Business Identification No. 0937588.  HA transacts or has transacted business in this district and throughout the United States.

4.     Upon information and belief, Robert Orlando resides at 8 Saddle Road, Monroe, Connecticut 06468. Orlando is the sole owner and sole member of HA, responsible for all aspects of HA's business and controls 100% of the business.  As such, Orlando was personally involved in all of the acts described herein, directed, approved, or authorized all such acts, and was the principal driving force behind all such acts alleged herein.  Orlando personally, and through the exercise of control of

HA, transacts or has transacted business in this district and throughout the United States.

## JURISDICTION AND VENUE

5.      This action arises under the Lanham Act, 15 U.S.C. § 1051, *et seq.* and state statutory and common law, including the California Unfair Competition Law ("UCL") and Connecticut Unfair Trade Practices Act ("CUTPA").  This Court has jurisdiction over the subject matter of this action under Section 39 of the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338.  This court also has jurisdiction under 15 U.S.C. § 1367 because the UCL, CUTPA, and state common law claims are substantially related to the claims under federal law and arise from the same body of operative facts and ongoing dispute between Plaintiff and Defendants.

6.      This court also has original jurisdiction under 28 U.S.C. § 1332, in that it is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand dollars.

7.      This Court has personal jurisdiction over HA and Orlando because HA and Orlando have conducted substantial business in the state of California in connection with these claims.

8.      This Court also has personal jurisdiction over HA and Orlando because they have engaged in intentional conduct expressly aimed at California knowing that Hylete is located in California, has actual or potential customers in California, and is likely to suffer harm in California as a result.

9.      Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### Hylete and the Hylete Marks

10.     Hylete is a performance apparel company specializing in sales of apparel, footwear, gear, and accessories for individuals who are involved in active or

3

CASE No. _____

"fitness" lifestyles.  Hylete manufactures and sells premium products that can withstand different strenuous activities.  Under its HYLETE brand, and its registered trademarks including U.S. Registration No.4318646; U.S. Registration No. 5542764; and U.S. Registration No. 4582589, as well as other marks which Hylete owns and uses (the "Hylete Marks"), Hylete promotes, advertises, offers for sale and sells products to its consumers in the United States, including consumers who participate in functional fitness, cross-training and CrossFit.

11.   Hylete was formed in or around March 2012. At that time, Hylete's principal Ron Wilson independently created the Hylete logo, Serial Number 85837045 (the "Logo Mark"), and the HYLETE word mark, Registration Number 4318646 (the "Word Mark").  For the Word Mark, Mr. Wilson independently created a fanciful, wholly fictitious word. For the Logo Mark, Mr. Wilson sought to create a simple, aggressive, clean-looking logo that could stand alone without the Hylete name, and convey to consumers the infinite depth of capacity that elite, cross-training athletes possess.  Mr. Wilson created a series of drawings that used two circles as a starting point, and conveyed the look and feel of the infinity symbol. After narrowing the series of drawings down to eight (8) versions of the Logo Mark, Mr. Wilson sought the opinion of others and eventually narrowed it down to a single version.

12.   Hylete adopted the Word Mark and Logo Mark in good faith and did not steal or copy them from HA or any other entity. Indeed, before adopting the Word Mark and Logo Mark, Mr. Wilson conducted online searches and searches of the USPTO trademark database to make sure no other entities were using any marks that could be confusingly similar to the Logo Mark or Word Mark. At the time Mr. Wilson created the Hylete Marks, he was not aware of any of HA's purported trademarks and was not even aware of HA.

13.   On March 22, 2012, Hylete filed its application to register its HYLETE mark (U.S. Trademark Application Serial No. 85576904) in International Class 25

CASE NO. _____

for the following goods: "Athletic apparel, namely, shirts, pants, jackets, footwear, hats and caps [, athletic uniforms ]." The Examining Attorney searched Trademark Office records and found no registered or pending mark that was confusingly similar to the HYLETE mark. The mark was published for Opposition on August 14, 2012.

14. HA did not oppose Hylete's application to register the HYLETE mark. The application was granted and issued as U.S. Trademark Registration No. 4318646 on April 9, 2013.

15. On January 30, 2013, Hylete filed its application to register its ♉ mark in International Class 25 for use on the following goods and services: "Athletic apparel, namely, shirts, pants, shorts, jackets, footwear, hats and caps." On October 16, 2013, HA filed a Notice of Opposition to Hylete's application.

16. Hylete has expended significant time and resources in building a successful brand with an excellent reputation and goodwill in the industry.

17. As a result of Hylete's efforts, Hylete and its products have become known in the industry for, among other things, high quality performance apparel and excellent customer service.

**HA's and Orlando's Unlawful Interference with Hylete's Business**

18. After Hylete was formed in or around March 2012, Hylete reached out to numerous microinfluencers to help build awareness for Hylete's brand. One such microinfluencer was Orlando. In or around April 2012, Hylete sent Orlando mockups of the Hylete Logo Mark and Hylete Word Mark and asked Orlando if he would be interested in a co-promotion arrangement. Orlando declined Hylete's offer and accused Hylete of copying Orlando's and HA's marks.

19. Hylete refuted Orlando's accusations and specifically explained to Orlando why the Hylete Marks were not confusingly similar to Orlando's or HA's marks, and that Hylete did not steal any marks from HA or Orlando. For years after this exchange, neither Orlando nor HA disputed Hylete's representations.

20. When Orlando and HA declined Hylete's offer in or around April 2012,

DOCS 124847-000003/3886962.11                                          CASE NO. _____

Orlando's popularity in the CrossFit community was rapidly declining. In fact, Mr. Orlando's popularity in the CrossFit community was already declining prior to that time due, in part, to his disqualification from the 2011 CrossFit games. From 2011 to the present, Orlando and HA have only been able to maintain a relatively small social media following and Orlando's and HA's gyms have been struggling.

21.     Subsequent to Orlando and HA declining Hylete's offer in or around April 2012, Hylete started to become very successful. Upon realizing that he had missed out on a lucrative co-promotion opportunity with Hylete in 2012, Orlando became angry. While Hylete gained in popularity, Orlando's personal popularity in the CrossFit community was in steady decline. So, Orlando and HA embarked on a plan to destroy and/or disrupt Hylete's business and maliciously disparage Hylete to drive it from the marketplace. Orlando indicated he wanted to "crush those idiots," "kick[] the shit out of Hylete," and was "happy" to see Hylete suffer. Orlando also indicated that he wanted to "bury" Hylete and wanted to prevent Hylete from making "a single sale in the [CrossFit Community]."

22.     Orlando and HA unlawfully interfered with Hylete's business by publishing false and misleading statements about Hylete and Hylete's products, making false statements to Hylete's customers and potential customers, interfering with Hylete's business relationships and Hylete's fundraising efforts, and fraudulently obtaining trademark registrations (including a registration for a mark Orlando admitted he copied from another entity and a mark that he admitted is descriptive and generic).

23.     For example, beginning in or around 2013 and continuing to the present time, HA and Orlando have told (and directed HA's employees to tell) Hylete's customers and Hylete's potential customers that Hylete stole and/or copied HA's trademarks, to boycott Hylete and to not buy Hylete's products.

24.     During a CrossFit event in 2013, HA and Orlando told CrossFit that Hylete stole and/or copied HA's trademarks and told CrossFit to ban Hylete from all

CrossFit events.   CrossFit subsequently banned Hylete from all CrossFit events. Orlando indicated that he was happy to see Hylete suffer as a result of Hylete being banned from CrossFit events and that it "felt good."

25.   HA and Orlando have alleged that CrossFit is and was at all relevant times HA's and Orlando's attorneys.

26.   In 2013, HA and Orlando coordinated with CrossFit to oppose Hylete's application to register Hylete's Logo Mark based on HA's fraudulent "H" logo trademark application.

27.   Beginning in or around 2013 and continuing for several years thereafter, HA and Orlando posted statements on social media stating that Hylete stole and/or copied HA's trademarks, and directing readers to boycott Hylete and to not buy Hylete's products.

28.   Beginning in or around 2013 and continuing until at least 2018, HA and Orlando told (and directed HA's employees to tell) Hylete's customers in Connecticut that Hylete stole and/or copied HA's trademarks, to boycott Hylete and to not buy Hylete's products.

29.   In 2015, HA and Orlando coordinated with CrossFit to interfere with Hylete's fundraising efforts by falsely telling a potential Hylete investor that Hylete engaged in "flagrant theft" of HA's trademarks.   The potential investor did not ultimately invest in Hylete.   On information and belief, Orlando and CrossFit made similar statements to other potential investors in Hylete.

30.   HA's and Orlando's statements that Hylete stole and/or copied HA's trademarks were false, misleading and injurious.   First, contrary to the natural and plain meaning of the statements that HA had protectable rights in the purported HA trademarks, and that Hylete stole or copied those purported HA trademarks, HA in fact had no valid protectable trademark rights in the purported HA trademarks.

31.   For example, Orlando, HA's corporate designee, conceded in a recent deposition that he copied the "Hybrid" mark from someone else, that the purported

7

HYBRID ATHLETICS mark merely described HA's services, that the purported HYBRID ATHLETICS mark is generic for HA's services, and that numerous third parties have used and are using the identical marks or similar marks and, that for over ten years, HA failed to police any such third party uses.

32.     Accordingly, Hylete could not have stolen or engaged in "flagrant theft" of HA's intellectual property rights in HA's purported HYBRID ATHLETICS mark. Even if Hylete's mark was identical to HYBRID ATHLETICS – which it is not – HA simply had no protectable rights that could have been stolen, contrary to the plain message of the statements by HA and Orlando that Hylete stole and/or copied HA's trademarks.

33.     Second, even if HA had any protectable rights in the purported HA trademarks, the statement that Hylete stole and/or copied HA's trademarks is false. Hylete's principal Ron Wilson independently created the Hylete Word Mark and Hylete Logo Mark in good faith and did not steal or copy them from HA or any other entity. Indeed, before adopting the Hylete Word Mark and Hylete Logo Mark, Mr. Wilson conducted online searches and searches of the USPTO trademark database to make sure no other entities were using any marks that could be confusingly similar to the Hylete Logo Mark or Hylete Word Mark.  At the time Mr. Wilson created the Hylete Marks in March 2012, he was not aware of any of HA's purported trademarks and was not even aware of HA.

34.     The obvious and natural implication of these false and misleading statements was that Hylete lacked integrity because it improperly stole and infringed upon intellectual property rights belonging to HA.

35.     HA and Orlando not only made false, misleading and injurious statements, but also intentionally tailored their conduct so that it would specifically damage Hylete's business and reputation.

36.     HA and Orlando chose to make the false, misleading and injurious statements to Hylete's actual customers, Hylete's potential customers, Hylete's

CASE NO. _____

actual and potential customers in the CrossFit community, on social media, including Facebook, and to Hylete's potential investors.

37.     HA and Orlando did so in order to ensure that their false and injurious allegations about Hylete were seen by Hylete's competitors, current business partners, potential future business partners, potential investors, as well as by customers and potential customers.

38.     HA's and Orlando's false, misleading and injurious statements were effective at damaging Hylete's reputation with consumers and causing consumers and the public to believe that Hylete lacked integrity.  As detailed above, as a result of HA's and Orlando's false, misleading and defamatory statements, Hylete was banned from CrossFit events and potential investors declined to invest in Hylete. Hylete also suffered lost sales and damage to its valuable goodwill.

39.     Although HA and Orlando knew about Hylete's use of the Hylete Word Mark and Logo Mark since at least as early as 2012, HA waited until 2017 to initiate a trademark infringement action against Hylete, Case No. 3:17-CV-01767-VAB in United States District Court for the District of Connecticut (the "Connecticut Action").

**HA's Fraudulent Trademark Applications and Invalid Registrations**

40.     HA's and Orlando's strategic plan to harm Hylete is further evidenced by the timing of HA's and Orlando's trademark applications.  HA and Orlando only applied to register HA's marks after Hylete applied to register the Hylete Word Mark and Logo Mark.  And, in doing so, HA and Orlando committed fraud on the USPTO, as detailed below.

**HA and Orlando Knew that Its "H" logo Mark Was Not Registerable Based on an Earlier, Rejected Application - U.S. Trademark Application Serial No. 85095039 in International Class 41**

41.     On July 28, 2010, Orlando filed a trademark application Serial No. 85095039 ("Rejected Application") for a mark that is essentially identical to, but due

to claiming color, slightly more narrow than, the mark reflected in U.S. Trademark Registration No. 4480850 and the much-later issued ⚙ '469        Registration. Orlando filed this application for the mark in International Class 41 for use on the following goods and services: "Shirts, athletic equipment, athletic training, and [athletic] programming."

42.     In the Rejected Application, Robert Orlando, dba Hybrid Athletics LLC is identified as the Applicant/Owner and the entity designation for the Applicant/Owner is identified as a Connecticut limited liability company.

43.     In the Rejected Application, Orlando claimed to have first used the mark generally on August 1, 2008 and first used the mark in commerce on March 30, 2010. As evidence of use of the applied-for mark, Orlando submitted a specimen to the USPTO of its purported use of the mark.

44.     On November 6, 2010, the USPTO issued an Office Action rejecting Orlando's application because it found: (1) the applied-for mark was likely to be confused with the ⊖ mark in U.S. Registration No. 3656042 ("Blocking Registration"); (2) the applied-for mark, as used on the specimen provided, was merely a decorative or ornamental feature of the goods, and (3) the drawing of the mark differed from and was not substantially an exact representation of the mark on the specimen demonstrating the purported use of the mark, among other reasons.

45.     The ⊖ mark in the Blocking Registration had a filing date of January 1, 2008 and a first use in commerce date of April 15, 2009 and a registration date of July 14, 2009.

46.     The November 6, 2010 USPTO Office Action notified Orlando and Hybrid Athletics LLC of an inconsistency in the identified Applicant/Owner and the identified entity type.  Specifically, the Office Action stated that the name of an individual person appears in the section of the application intended for the owner's name but the entity type is set forth as a limited liability company.  The Office Action also notified Orlando and Hybrid Athletics LLC that if the identified

applicant was not the owner, the application was void as filed because only the owner of a mark may apply to register the mark.

47.    On April 27, 2011, Orlando responded to the USPTO Office Action.  In the Response to Office Action, Orlando did not dispute that Orlando's applied-for mark was likely to be confused with the ✪ mark in the Blocking Registration. Instead, Orlando submitted an additional specimen and an amended drawing of the mark, which materially altered the applied-for mark by adding the words "Hybrid Athletics".  On information and belief, the words "Hybrid Athletics" were added to the amended drawing of the mark in an attempt to differentiate its applied-for mark with the mark in the Blocking Registration.

48.    On May 16, 2011, the USPTO issued another Office Action maintaining its denial of Orlando's application for among other reasons: (1) likelihood of confusion with the Blocking Registration; (2) the evidence of usage submitted was for ornamental usage and did not constitute use of the mark as a trademark; (3) the drawing of the mark as amended was not accepted as it was substantively different from and materially altered the mark in the initial application; (4) the applicant did not provide a specimen of actual use of the mark but rather only submitted a picture of rendering of the applied-for mark as a specimen, among other reasons.  Without any further action from Orlando, the USPTO issued its Notice of Abandonment of the application on December 19, 2011.

49.    Orlando did not continue prosecuting the Rejected Application after the Notice of Abandonment.

50.    After abandoning the Rejected Application, Orlando did not seek to register its 🜨 mark anywhere until well after Hylete had begun achieving success in its apparel business.

CASE NO. _____

**HA Applies for and Eventually Obtains U.S. Trademark Registration No. 4480850 for the Service Mark in International Class 41**

51.     On July 2, 2013 – a few months after Hylete's successful registration of its Word Mark as U.S. Trademark Registration No. 4318646, and more than six months after Hylete filed its application to register its Logo Mark in International Class 25, Orlando filed a trademark application (Serial No. 86000809) for the service mark in International Class 41 for use with the following services: "Conducting fitness classes; Health club services, namely, providing instruction and equipment in the field of physical exercise;  Personal fitness training services and consultancy; Physical fitness instruction."

52.     In the trademark application, Orlando is identified as the Applicant/Owner and the entity designation for the Applicant/Owner is identified as an individual.

53.     In the trademark application, an attorney is identified as the Correspondent to receive official communications about the application from the USPTO.

54.     In the trademark application and the subsequently issued registration, Orlando claimed to have first used the mark generally on August 1, 2008 and first used the mark in commerce on August 1, 2008.

55.     However, at the time of the application on July 2, 2013 and for the entire period since the alleged first use on August 1, 2008, Orlando was not the owner of the mark.  The mark was owned by HA, which was formed in May 2008. By identifying an applicant who was not the proper owner of the mark, the application was void *ab initio*.

56.     In an attempt to correct the fatal error of identifying an applicant who was not the proper owner of the mark, on October 15, 2013, less than four (4) months after filing the application and one (1) day prior to filing a notice of opposition to Hylete's Logo Mark application, Orlando improperly executed and

recorded a Trademarks Assignment purporting to assign the trademark application to HA when HA was already the owner of the mark.

57.     Despite the fatal error of identifying an applicant who was not the proper owner of the mark and improperly attempting to assign the application to HA when HA was already the owner of the mark, the application registered (Reg. No. 4480850) on February 11, 2014.

**HA Fraudulently Applies for and Eventually Obtains U.S. Trademark Registration No. 4,722,185 for HYBRID ATHLETICS in International Class 41**

58.     On July 2, 2013, Orlando filed a trademark application (Serial No. 86000800) for the mark HYBRID ATHLETICS in International Class 41 for use on the following goods and services:  "Conducting fitness classes; Health club services, namely, providing instruction and equipment in the field of physical exercise; Personal fitness training services and consultancy; Physical fitness instruction."

59.     In the trademark application, Orlando is identified as the Applicant/Owner and the entity designation for the Applicant/Owner is identified as an individual.

60.     In the trademark application, an attorney is identified as the Correspondent to receive official communications about the application from the USPTO.

61.     In the trademark application and the subsequently issued registration, Orlando claimed to have first used the mark generally on August 1, 2008 and first used the mark in commerce on August 1, 2008.

62.     However, at the time of the application on July 2, 2013 and for the entire period since the alleged first use on August 1, 2008, Orlando was not the owner of the mark.  The mark was owned by HA, which was formed in May 2008. By identifying an applicant who was not the proper owner of the mark, the application was void *ab initio*.

63.     In an attempt to correct the fatal error of identifying an applicant who

13

CASE NO. _____

was not the proper owner of the mark, on October 15, 2013, less than four (4) months after filing the application and one (1) day prior to filing a notice of opposition to Hylete's Logo Mark application, Orlando improperly executed and recorded a Trademarks Assignment purporting to assign the trademark application to HA when HA was already the owner of the mark.

64.   On October 25, 2013, the USPTO issued an Office Action rejecting the application for the HYBRID ATHLETICS service mark for being merely descriptive of the services offered.  Assignee HA responded to the Office Action on April 24, 2014 explaining that it had used the mark since August 2008 and that the mark had therefore acquired distinctiveness.

65.   On May 9, 2014, the USPTO again issued an Office Action rejecting Assignee HA's claims that the HYBRID ATHLETICS mark had acquired distinctiveness.

66.   On November 10, 2014, Assignee HA responded to the second Office Action and submitted evidence that purportedly showed that the HYBRID ATHLETICS mark was used in commerce and had acquired distinctiveness as a result of Assignee HA's "substantially exclusive and continuous" use in promoting its CrossFit gym, and for its CrossFit Strongman Trainer courses over the preceding five years.

67.   Throughout the application process, Orlando (individually and on HA's behalf) made false representations of material fact in a deliberate attempt to mislead the USPTO.  In his July 2, 2013 application, Orlando declared that "no other person, firm, corporation, or association has the right to use the [HYBRID ATHLETICS] mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive…".  In his November 10, 2014 declaration, Orlando declared that HYBRID ATHLETICS "is recognized in the trade and by consumers as [Assignee HA's] trademark, and as

exclusively indicating [Assignee HA's] products and services."  These were each false representations of fact and Orlando knew that the representations were false at least because Orlando has admitted that he copied the "Hybrid" mark from another entity and Orlando was aware of other entities using the identical or similar marks, at least based on the prior filed applications the USPTO notified him of (including HYBRID KICKBOXING, now Reg. No. 4442736, with a first use date in commerce of January 1, 2000).  Moreover, Orlando testified that he believes that HYLETE is confusingly similar to HYBRID ATHLETICS, and Orlando was aware of Hylete's substantial use of the HYLETE mark since 2012. Orlando's misrepresentations were not an error or inadvertence; rather, they were a deliberate attempt to mislead the USPTO.  The misrepresentations were also material at least because the USPTO would not have allowed the application if the applicant could not prove acquired distinctiveness through substantially exclusive use.

68.    After the additional declaration and representations, and in reliance on the authenticity of the statements made therein, the USPTO finally allowed the application to register (Reg. No. 4722185) on April 21, 2015.

## HA Fraudulently Applies for and Obtains the '469 Registration for the  Mark in International Class 25

69.    On February 21, 2014, more than a year after Hylete's application to register its Logo Mark and several months after HA filed its Notice of Opposition to Hylete's application to register Hylete's Logo Mark, and about 10 days after its application to register the  mark in International Class 41 was granted, HA filed trademark application (Serial No. 86199948) for the  mark in International Class 25 for use on the following goods and services: "Bottoms; Headwear; Tops."

70.    In the trademark application, HA is identified as the Applicant/Owner and the entity designation for the Applicant/Owner is identified as a Connecticut limited liability company.

CASE NO. _____

71.   In the trademark application, an attorney is identified as the Correspondent to receive official communications about the application from the USPTO.

72.   In the trademark application and the subsequently issued registration, HA claimed to have first used the ⬆ mark generally as of December 31, 2008 and to have first used the ⬆ mark in commerce as of December 31, 2008. In the application, HA also claimed that on the filing date, the mark was "now in such use in commerce."

73.   To support its application for registration, HA also provided specimens of shorts co-branded with JACO which included the ⬆ as allegedly used in commerce; images of hats on which the ⬆ mark was affixed, and an image of a jacket on which the ⬆ mark was affixed. HA also included a black and white drawing of the mark it sought to register.

74.   HA knew that the ⬆ mark was not in use in commerce as of December 31, 2008.  Indeed, in the July 28, 2010 Rejected Application, Orlando declared that the mark was first used in commerce on March 30, 2010 – not December 31, 2008.  The only reason HA and/or HA's attorney would conceal the previously identified March 30, 2010 first use date and instead choose a much earlier December 31, 2008 date is in an attempt to avoid the Blocking Registration No. 3656042 ⊖, which had a date of first use in commerce of April 15, 2009. HA and/or HA's attorney knew that Blocking Registration No. 3656042 ⊖ would be a problem, either from a registration, opposition or cancellation standpoint, because the USPTO had previously rejected the Rejected Application filed by Orlando dba Hybrid Athletics LLC as Trademark Application Serial No. 85095039 for a nearly identical mark because it was found to be confusingly similar to Blocking Registration No. 3656042 ⊖.

75.   Notably, in the Connecticut Action, HA has not been able to provide any documentation to support its contention that it first used the ⬆ mark with

16

bottoms, headwear or tops prior to December 31, 2008.  In fact, HA has admitted that, about a year or two ago, it intentionally deleted electronic documents dated prior to 2011, and has also stated that bottoms were sold "after December 31, 2008."

76.   HA and/or HA's attorney also tried to conceal Blocking Registration No. 3656042 ✛ by making false statements to the USPTO.  In HA's February 21, 2014 application, Orlando declared, on HA's behalf, that "no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive…".  This was a false representation of fact and Orlando knew that the representation was false at least because Orlando was informed by the USPTO, in relation to his Rejected Application filed on July 28, 2010, that the ✛ mark was likely to be confused with Blocking Registration No. 3656042 ✛, particularly when used on the same goods (i.e. athletic apparel). The USPTO specifically informed Orlando, in an office action dated November 16, 2010, that the ✛ mark and Blocking Registration No. 3656042 ✛ "are highly similar in appearance and create highly similar commercial impressions." HA did not argue against the likelihood of confusion refusal, and instead attempted to amend the drawing of its mark to differentiate it from Blocking Registration No. 3656042 ✛ by adding HYBRID ATHLETICS. HA's misrepresentations were not an error or inadvertence; rather, they were a deliberate attempt to mislead the USPTO.  The misrepresentations were also material at least because the USPTO had previously rejected the Rejected Application filed by Orlando dba Hybrid Athletics LLC as Trademark Application Serial No. 85095039 for a nearly identical mark because it was found to be confusingly similar to Blocking Registration No. 3656042 ✛.

77.   On information and belief, in reliance on the statements and representations of HA and/or HA's attorney the USPTO allowed HA's application to register the ✛ mark (the '469 Registration) on September 23, 2014.

17

78.     On October 23, 2017, HA filed the Connecticut Action against Hylete alleging, among other things, infringement of U.S. Trademark Registration No. 4,480,850, the '469 Registration, and U.S. Trademark Registration No. 4,722,185, based on Hylete's marketing and sales of apparel bearing the Hylete Marks.

79.     There is an actual, substantial and continuing justiciable controversy between Hylete and HA as to HA's right to bring and maintain a suit for infringement of U.S. Trademark Registration No. 4,480,850, the '469 Registration, and U.S. Trademark Registration No. 4,722,185, and as to the validity of those trademark registrations.

## COUNT 1

**(Fraudulent Procurement of U.S. Trademark Registration No. 4,609,469)**

**[Against HA]**

80.     Hylete repeats and incorporates by reference the allegations in the preceding paragraphs as though set forth fully herein.

81.     HA falsely declared and/or omitted material facts when it stated in Trademark Application Serial No. 86199948 that the mark in the '469 Registration had been used on bottoms, headwear, and/or tops by December 31, 2008.

82.     At the time of filing the subject trademark application, HA, through its sole member Orlando, knew that HA had not used the mark in the '469 Registration on bottoms, headwear, and tops by December 31, 2008.

83.     HA and/or HA's attorney also tried to conceal Blocking Registration No. 3656042 ⊖ by making false statements to the USPTO. HA's misstatements and/or omissions of fact were intentional and deliberate and were calculated to mislead the PTO into issuing a registration to HA.

84.     HA's misrepresentations and/or omissions of fact to the USPTO were material to the USPTO's decision to issue the '469 Registration.

85.     At the time of filing the subject trademark application, HA knew that citing any date of "first use in commerce" later than April 15, 2009 would result in

CASE NO. _____

the USPTO rejecting the trademark application based on at least the Blocking Registration No. 3656042 which had a date of first use of April 15, 2009.  This is what the PTO had previously done when Orlando had first applied to register the identical mark (in color) in the Rejected Application Serial No. 85095039.

86.    Hylete is informed and believes, and on that basis alleges that but for the misrepresentations and/or omissions of fact about the December 31, 2008 date of first use, the USPTO would not have issued the '469 Registration, based at least on the existence of the Blocking Registration which had a date of first use in commerce of April 15, 2009.

87.    By reason of the foregoing, HA improperly and fraudulently procured the '469 Registration.

88.    The persistence of the fraudulently obtained '469 Registration on the Principal Register has harmed and continues to harm Hylete.  For example, as a direct and proximate result of HA's fraudulent registration, and in an effort to counteract the effects of the mark's registration, Hylete has lost revenue from cessation of its use of its own mark on its products.  Hylete has also incurred increased costs of restructuring its business operations, development of new marks, and marketing expenses, among other damages.  In an effort to counteract the effects of the mark's registration, Hylete has also expended significant employee time and has thereby missed out on the benefits it would have gained if such employees had devoted their time and efforts to developing Hylete's business in other respects.

89.    As a direct and proximate result of the persistence of the '469 Registration on the Principal Register, Hylete has been and continues to be damaged as exemplarily noted above, and pursuant to 15 U.S. C. § 1120, is entitled to recover such damages in an amount to be proven at trial.

## COUNT 2

**(Cancellation of U.S. Trademark Registration No. 4,609,469 – Fraud)**

**[Against HA]**

90.     Hylete repeats and incorporates by reference the allegations in the preceding paragraphs as though set forth fully herein.

91.     HA falsely declared and/or omitted material facts when it stated in Trademark Application Serial No. 86199948 that the mark in the '469 Registration had been used on bottoms, headwear, and/or tops by December 31 2008.

92.     At the time of filing the subject trademark application, HA, through its sole member Orlando, knew that HA had not used the mark in the '469 Registration on bottoms, headwear, and tops by December 31, 2008.

93.     HA and/or HA's attorney also tried to conceal Blocking Registration No. 3656042 ⊖ by making false statements to the USPTO. HA's misstatements and/or omissions of fact were intentional and deliberate and were calculated to mislead the PTO into issuing a registration to HA.

94.     HA's misrepresentations and/or omissions of fact to the USPTO were material to the USPTO's decision to issue the '469 Registration.

95.     At the time of filing the subject trademark application, HA knew that citing any date of "first use in commerce" later than April 15, 2009 would result in the USPTO rejecting the trademark application based on at least Blocking Registration No. 3656042 which had a date of first use of April 15, 2009.  This is what the PTO had previously done when Orlando had first applied to register the identical mark (in color) in the Rejected Application Serial No. 85095039.

96.     Hylete is informed and believes, and on that basis alleges, that but for the misrepresentations and/or omissions of fact about the December 31, 2008 date of first use, the USPTO would not have issued the '469 Registration, based at least on the existence of the '042 Registration which had a date of first use in commerce of April 15, 2009.

20

CASE NO. _____

97.     By reason of the foregoing, HA improperly and fraudulently obtained the '469 Registration, which should be cancelled.

## COUNT 3

### (Violation of Lanham Act 15 U.S.C. § 1125(a) - False Advertising)
### [Against HA and Orlando]

98.     Hylete repeats and incorporates by reference the allegations in the preceding paragraphs as though set forth fully herein.

99.     HA and Orlando have made false and misleading statements of fact regarding Hylete and Hylete's products in interstate commerce and in this District.

100.    These statements actually deceive, or have a tendency to deceive, a substantial segment of Hylete's customers or potential customers by causing them to believe that Hylete stole HA's purported trademarks and applied them to Hylete's products.

101.    This deception is material because it injured Hylete's reputation with its customers by causing them to believe that Hylete engaged in illegal and improper conduct, and was thus likely to influence its potential customers' purchasing decisions. By attacking Hylete's integrity, HA and Orlando impugned the reputation of Hylete and its products.

102.    HA's and Orlando's false and misleading advertising statements and omissions injured Hylete by damaging its business reputation among consumers and harming its commercial interests in sales.

103.    The acts of HA and Orlando complained of herein with respect to HA's and Orlando's intentionally and knowingly false, misleading, injurious statements, were untrue and constituted false advertising in violation of Section 43 *et seq.*, of the Lanham Act, and, as a result, consumers and Hylete have been harmed.

104.    Pursuant to 15 U.S.C. § 1117(a), Hylete is entitled to recover all of HA's and Orlando's profits as well as the costs of this action and pre-judgment

interest. HA's and Orlando's conduct was undertaken willfully and with the intention of causing confusion, mistake or deception, which makes this an exceptional case and entitles Hylete to recover additional damages and attorneys' fees under 15 U.S.C. § 1117(a).

105.  Hylete will suffer and is suffering irreparable harm from HA's and Orlando's unlawful conduct insofar as Hylete's invaluable goodwill is being eroded by such continuing unlawful conduct.  Hylete has no adequate remedy at law to compensate it for the loss of business reputation, customers, market position, and goodwill flowing from HA's and Orlando's unlawful conduct.  Hylete is informed and believes that unless enjoined by the Court, HA and Orlando will continue their unlawful conduct.

## **COUNT 4**

### **(Violation of California Unfair Competition Law, Business and Professions Code § 17200, *et seq*. - Unfair Methods of Competition and Unfair/Deceptive/Unlawful Acts or Practices) [Against HA and Orlando]**

106.  Hylete repeats and incorporates by reference the allegations in the preceding paragraphs as though set forth fully herein.

107.  HA and Orlando have engaged in unlawful, unfair and/or fraudulent business acts or practices and unfair, deceptive, untrue or misleading advertising in the conduct of trade or commerce.  HA and Orlando unlawfully interfered with Hylete's business by publishing false and misleading statements about Hylete and Hylete's products, making false statements to Hylete's customers and potential customers, interfering with Hylete's business relationships and Hylete's fundraising efforts, fraudulently obtaining trademark registrations, and using those fraudulently-obtained trademark registrations and other invalid trademarks to further support the baseless assertions against Hylete.

108.  HA and Orlando made false and misleading statements about Hylete and Hylete's products in such manner as to imply business dishonesty and

CASE No. _____

substandard product performance, including untrue statements that Hylete stole and/or copied HA's purported trademarks and applied them to Hylete's products and that Hylete engaged in unethical business practices.

109.   HA and Orlando coordinated with CrossFit to interfere with Hylete's fundraising efforts by falsely telling a potential investor in Hylete that Hylete engaged in "flagrant theft" of HA's trademarks.

110.   HA and Orlando and HA's employees/coaches intentionally, falsely and maliciously made disparaging comments about Hylete and Hylete's products.

111.   Hylete has expended time and resources in an effort to obtain an excellent reputation and goodwill in the industry.

112.   At all relevant times, HA's and Orlando's conduct was intentional and in wanton violation of Hylete's rights, or was done with reckless disregard for those rights.

113.   The foregoing constitutes unlawful, unfair or fraudulent business acts or practices and unfair, deceptive, untrue or misleading advertising in the conduct of trade or commerce in violation of the California Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §§ 17200 *et seq.*).

114.   HA's and Orlando's unlawful, unfair, fraudulent, deceptive, and misleading acts or practices offend public policy as has been established by the Lanham Act (15 U.S.C. §§ 1051 *et seq.*), the common law, and/or is otherwise within at least the penumbra of common-law, statutory, or other established concept of unfairness.

115.   HA's and Orlando's acts are immoral, unethical, oppressive, and/or unscrupulous.

116.   As a result of HA's and Orlando's unfair and deceptive conduct and practices, Hylete has suffered and will continue to suffer ascertainable loss and money damages.

117.   Hylete will suffer and is suffering irreparable harm from HA's and

CASE NO. _____

Orlando's unlawful conduct insofar as Hylete's invaluable goodwill is being eroded by such continuing unlawful conduct. Hylete has no adequate remedy at law to compensate it for the loss of business reputation, customers, market position, and goodwill flowing from HA's and Orlando's unlawful conduct. Hylete is informed and believes that unless enjoined by the Court, HA and Orlando will continue their unlawful conduct.

## COUNT 5

**(Violation of Connecticut Unfair Trade Practices Act - Unfair Methods Of Competition and Unfair/Deceptive Acts or Practices) [Against HA and Orlando]**

118. Hylete repeats and incorporates by reference the allegations in the preceding paragraphs as though set forth fully herein.

119. HA and Orlando have engaged in unfair methods of competition and unfair acts or deceptive acts or practices in the conduct of trade or commerce. HA and Orlando unlawfully interfered with Hylete's business by publishing false and misleading statements about Hylete and Hylete's products, making false statements to Hylete's customers and potential customers, interfering with Hylete's business relationships and Hylete's fundraising efforts, fraudulently obtaining trademark registrations, and using those fraudulently-obtained trademark registrations to further support the baseless assertions against Hylete.

120. HA and Orlando made false and misleading statements about Hylete and Hylete's products in such manner as to imply business dishonesty and substandard product performance, including untrue statements that Hylete stole and/or copied HA's purported trademarks and applied them to Hylete's products and that Hylete engaged in unethical business practices.

121. HA and Orlando coordinated with CrossFit to interfere with Hylete's fundraising efforts by falsely telling a potential investor in Hylete that Hylete engaged in "flagrant theft" of HA's trademarks.

122. HA and Orlando and HA's employees/coaches intentionally, falsely and

24

maliciously made disparaging comments about Hylete and Hylete's products.

123.   Hylete has expended time and resources in an effort to obtain an excellent reputation and goodwill in the industry.

124.   At all relevant times, HA's and Orlando's conduct was intentional and in wanton violation of Hylete's rights, or was done with reckless disregard for those rights.

125.   The foregoing constitutes unfair methods of competition and unfair acts or deceptive acts or practices in the conduct of trade or commerce in violation of the Connecticut Unfair Trade Practices Act ("CUTPA") (Conn. Gen. Stat. §§ 42-110(a) *et seq.*).

126.   HA's and Orlando's unfair and deceptive acts or practices offend public policy as has been established by the Lanham Act (15 U.S.C. §§ 1051 *et seq.*), the common law, and/or is otherwise within at least the penumbra of common-law, statutory, or other established concept of unfairness.

127.   HA's and Orlando's acts are immoral, unethical, oppressive, and/or unscrupulous.

128.   As a result of HA's and Orlando's unfair and deceptive conduct and practices, Hylete has suffered and will continue to suffer ascertainable loss and money damages.

129.   Hylete will suffer and is suffering irreparable harm from HA's and Orlando's unlawful conduct insofar as Hylete's invaluable goodwill is being eroded by such continuing unlawful conduct. Hylete has no adequate remedy at law to compensate it for the loss of business reputation, customers, market position, and goodwill flowing from HA's and Orlando's unlawful conduct.  Hylete is informed and believes that unless enjoined by the Court, HA and Orlando will continue their unlawful conduct.

/ / /

/ / /

CASE NO. _____

## COUNT 6

### (Tortious Interference with Prospective Economic Advantage)

### [Against HA and Orlando]

130.    Hylete repeats and incorporates by reference the allegations in the preceding paragraphs as though set forth fully herein.

131.    Hylete maintains or has maintained economic relationships with both existing and potential customers and investors that are likely to result in future economic benefit to Hylete.

132.    HA and Orlando know about Hylete's relationships with its existing and potential customers and investors.

133.    HA and Orlando have made and published injurious and disparaging statements about Hylete and Hylete's products in such manner as to imply business dishonesty and substandard product performance, including untrue statements that Hylete stole and/or copied HA's purported trademarks and applied them to Hylete's products and that Hylete engaged in unethical business practices.

134.    HA and Orlando made these false and misleading statements to Hylete's actual customers, Hylete's potential customers, Hylete's actual and potential customers in the CrossFit community, on social media, including Facebook, and to Hylete's potential investors, knowing that the statements were misleading and deceptive, for the improper purpose of disparaging Hylete and Hylete's products and interfering with Hylete's business relationship with these parties by encouraging them to discontinue their business with Hylete.

135.    These statements were publically and intentionally made, and knowingly false and made in an effort to gain unfair advantage in the marketplace.

136.    As a direct and proximate cause of such statements Hylete and its products have suffered actual and/or special damages, including the value of Hylete's reputation, lost business opportunities and investors, and/or economic loss.

137.    Hylete will suffer and is suffering irreparable harm from HA's and

1   Orlando's unlawful conduct insofar as Hylete's invaluable goodwill is being eroded
2   by such continuing unlawful conduct.  Hylete has no adequate remedy at law to
3   compensate it for the loss of business reputation, customers, market position, and
4   goodwill flowing from HA's and Orlando's unlawful conduct. Hylete is informed
5   and believes that unless enjoined by the Court, HA and Orlando will continue their
6   unlawful conduct.

### **HYLETE'S PRAYER FOR RELIEF**

8       WHEREFORE, Hylete prays that the Court: (1) issue an Order cancelling
9   United States Trademark Registration No. 4609469, and award Hylete its damages
10  sustained as a result of this fraudulent registration; (2) declare that HA's and
11  Orlando's acts and practices as set forth herein constitute unfair competition in
12  violation of § 43(a) of the Lanham Act, and award Hylete damages resulting
13  therefrom, including but not necessarily limited to compensatory damages, lost
14  profits, and/or a disgorgement of HA's and Orlando's profits as permitted by law;
15  (3) declare that HA's and Orlando's acts and practices as set forth herein are in
16  violation of the California Unfair Competition Law ("UCL"), and award Hylete
17  damages resulting therefrom, including but not necessarily limited to compensatory
18  damages, lost profits, and/or a disgorgement of HA's and Orlando's profits as
19  permitted by law; (4) declare that HA's and Orlando's acts and practices as set forth
20  herein are in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"),
21  and award Hylete damages resulting therefrom, including but not necessarily limited
22  to compensatory damages, lost profits, and/or a disgorgement of HA's and Orlando's
23  profits as permitted by law; (5) award Hylete any and all damages that they are
24  entitled to by law by virtue of HA's and Orlando's acts as complained of herein;
25  (6) order HA and Orlando to account to Hylete for any and all profits, gains,
26  advantages, and unjust enrichment derived by HA or Orlando and all damages
27  sustained by Hylete by reason of HA's and Orlando's acts complained of herein;
28  (7) declare that HA's and Orlando's acts as complained of herein were deliberate and

27

willful, and that this be deemed an exceptional case pursuant to 15 U.S.C. § 1117 and/or CUTPA, and further ordering that Hylete shall be entitled to treble damages; (8) order an award of punitive and exemplary damages against HA and Orlando by reason of their willful wrongful acts and their deliberate conduct described herein; (9) award Hylete its costs and attorney's fees as permitted by law; (10) permanently enjoin and restrain Orlando and HA, and their officers, agents, servants, employees, attorneys, and all those persons in active concert or participation with, through or under any of them from further false, misleading and/or disparaging statements regarding Hylete or Hylete's products; and (11) award such other and further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Hylete hereby demands a trial by jury of all issues so triable in this action.

DATED: December 30, 2019

PROCOPIO, CORY, HARGREAVES & SAVITCH LLP


By:  /s/ Dave Deonarine
Dave Deonarine (Bar No. 243733)
Pattric J. Rawlins (Bar No. 205160)
Jacob K. Poorman (Bar No. 262261)

Attorneys for Plaintiff Hylete, Inc.

CASE NO. _____